IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 1:19-cr-234-ALB-JTA |
| JIMMY LAMAR BERRY | ) | |
| | ) | |

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This cause is before the court on Defendant Jimmy Lamar Berry's motion to suppress evidence (Doc. No. 38) and the Government's response in opposition thereto (Doc. No. 40).  The court held an evidentiary hearing on the motion on January 6, 2020. (Doc. No. 52, Tr.)  After due consideration of the parties' arguments, witness testimony and applicable law, the court concludes that the motion to suppress is due to be denied.

## I.      FACTUAL BACKGROUND

While investigating a homicide that occurred on August 23, 2017 at 815 McKay Street in Dothan, Alabama, Investigator Charles Faulkner ("Investigator Faulkner") of the Dothan Police Department ("DPD") received information that one of the suspects was dropped off in the 700 block of Monroe Street shortly before the murder and "was seen speaking with people in front of the residence across from 718 Monroe Street."[1]  (Doc. No. 40-2 at 1.)  Two days later, on August 25, 2017, DPD was called to the Southeast Alabama Medical Center where officers interviewed a firearm assault victim who reported being

---

[1] 815 McKay Street is approximately one mile from 718 Monroe Street.  (Doc. No. 38 at 6; Doc. No. 52, Tr. at 18.)

shot in the 700 block of Monroe Street.  (*Id.*)  The victim reported seeing the suspect flee into the back yard of 718 Monroe Street.  (*Id.*)  The officers went to the area and found 9mm shell casings in the road in front of 718 Monroe Street.  (*Id.*)  They also observed that the house at that address had exterior surveillance cameras, one of which was directed toward the location of the shooting and the shell casings.  (*Id.*)  Officers determined the house was the residence of Defendant Jimmy Lamar Berry ("Berry").  (Doc. No. 40-3; Doc. No. 40-1 at 4.)  Based on DPD's prior interactions with Berry, officers believed he was unlikely to allow them access to any evidence from his cameras without a search warrant.  (Doc. No. 52, Tr. at 52-53; Doc. No. 40-1 at 4.)

Investigator Faulkner prepared an affidavit in support of a search warrant for Berry's residence for any evidence relevant to the murder and firearm assault.  (Doc. No. 40-2.)  The affidavit stated that DPD had reason to believe the residence contained "evidence related to a firearm assault investigation that occurred on August 25, 2017 in the 700 block of Monroe Street" and "evidence at the same location which is related to a murder which occurred at 815 McKay Street . . . on August 23, 2017."  (*Id.*)  As to the murder, the affidavit referenced the information regarding a suspect being seen speaking with people in front of the residence across from 718 Monroe Street prior to the murder.  (*Id.*)  As to the firearm assault, the affidavit referenced the victim's statement regarding the shooter fleeing into the back yard of 718 Monroe Street, the officers' recovery of the 9mm shell casings in front of 718 Monroe Street and that an exterior camera was pointed toward the area of the August 25 shooting.  (*Id.*)  The affidavit described the 718 Monroe Street residence as a "single family dwelling with a raised front porch. . . . with a new privacy

fence around the property and a Caviler pull behind camper in the back yard. . . . and it appears the residence [is] under renovations." (*Id*. at 2.)

On August 28, 2017, Houston County Circuit Judge Butch Binford reviewed the affidavit and authorized the search of "718 Monroe Street Dothan, AL, any and all vehicles on the property, any and all out buildings, and a white Caviler pull behind camper" for "[a]ny and all evidence related to the firearm assault which occurred in [sic] 08/25/2017 and the murder which occurred on 8/23/2017 at 815 McKay Street." (Doc. No. 40-3 at 1.) The warrant specifically included "any DVR recording systems or electronic devices capable of recording or storing video footage, or any firearms or firearm equipment, or ammunition." (*Id*.)

DPD officers executed the search warrant at Berry's residence. While in the process of securing Berry's residence, storage shed and camper, the officers observed in plain view a handgun and a plastic spoon with "white powder residue" in an open kitchen cabinet, a box of ammunition on a kitchen counter, a Glock pistol in the camper and several lawn equipment items that looked brand new or were in original packaging in the storage shed. (Doc. No. 40-1 at 4.) The officers' sighting of possible contraband and firearms caused them to suspend the search and apply for a second search warrant targeting drugs, drug paraphernalia, firearms and stolen property. (*Id*.) Investigator Faulkner's second affidavit recounted the items found on Berry's property earlier that afternoon and requested permission "to collect any possible stolen property, drugs, or narcotic equipment" which may be located at Berry's residence, any and all out buildings, and camper. (Doc. No. 40-4 at 1.)

Judge Binford reviewed the second affidavit (Doc. No. 40-4) and approved a warrant (Doc. No. 40-5 at 1) for officers to resume their search of Berry's property under the scope of the first and second warrant.  DPD officers executed the search and located a computer, DVR, security viewer, two cell phones, two digital scales, a .38 revolver, .45 caliber ammunition, a 9 mm pistol, a Husquavarna chainsaw and various bags of suspected drugs.  (Doc. No. 40-5 at 2.)

The electronic equipment collected during the search prompted DPD Corporal Tim Mullis to prepare a third affidavit in support of a search warrant.  (Doc. No. 40-6; Doc. No. 51, Gov. Ex. 4.)  The affidavit was presented to a municipal judge for the City of Dothan on August 30, 2017.  (Doc. No. 40-6 at 2; Doc. No. 51, Gov. Ex. 4.)  The resulting warrant cleared DPD to search all electronic equipment taken during the search of Berry's residence.  (*Id.*)

On June 5, 2019, a grand jury sitting in the Middle District of Alabama returned a five-count indictment against Berry, alleging one count of possession of a firearm as a convicted felon on May 20, 2017, and four other counts which stemmed from the August 28, 2017 searches.  (Doc. No. 1.)  On July 11, 2019, DPD Investigator Jake Gillilan prepared an affidavit in support of a search warrant for Berry's residence based upon the smell of marijuana emanating from the residence during the execution of Berry's arrest warrant for the June 5, 2019 indictment.  (Doc. No. 40-7; Doc. No. 52, Tr. at 63-64.)  Judge Binford authorized another search of the residence (Doc. No. 40-8 at 2-3), during which officers recovered a firearm, marijuana, and cocaine (Doc. No. 40-8 at 3).

## II.    PROCEDURAL HISTORY

The grand jury returned a second superseding indictment against Berry on September 13, 2019, alleging a total of seven counts.[2]  (Doc. No. 29.)  Specifically, the second superseding indictment alleges the following offenses:

1. On May 20, 2017, Berry possessed a firearm and ammunition after having previously been convicted of a felony in violation of 18 U.S.C. §§ 922(g)(1) and 924(e);
2. On August 28, 2017, Berry possessed a firearm and ammunition after having previously been convicted of a felony in violation of 18 U.S.C. §§ 922(g)(1) and 924(e);
3. On August 28, 2017, Berry possessed with intent to distribute five grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1);
4. On August 28, 2017, Berry possessed with intent to distribute a detectable amount of marijuana in violation of 21 U.S.C. § 841(a)(1);
5. On August 28, 2017, Berry possessed with intent to distribute a detectable amount of cocaine hydrochloride or "cocaine powder" in violation of 21 U.S.C. § 841(a)(1);
6. On July 11, 2019, Berry possessed a firearm and ammunition after having previously been convicted of a felony offense in violation of 18 U.S.C. §§ 922(g)(1) and 924(e); and
7. On July 11, 2019, Berry possessed with intent to distribute a detectable amount of marijuana in violation of 21 U.S.C. § 841(a)(1).

(Doc. No. 29.)  On September 24, 2019, Berry was arraigned and entered a plea of not guilty.  (Doc. No. 34.)

On October 25, 2019, Berry filed his motion to suppress seeking exclusion of the physical evidence seized from his residence by law enforcement in August 2017 and July 2019.  (Doc. No. 38.)  The Government filed its response in opposition on November 15, 2019.  (Doc. No. 40.)  This matter is ripe for disposition.

---

[2] A superseding five-count indictment was returned against Berry on August 7, 2019.  (Doc. No. 15.)

# III.   DISCUSSION

A. Berry's Motion to Suppress

Berry argues the initial search warrant affidavit of August 28, 2017 lacked probable cause as to his involvement in criminal conduct and the likelihood that evidence related to the murder or firearm assault would be found on his property.[3]  (Doc. No. 38 at 2-3.)  Berry contends the succeeding search warrants were the direct result of the first search warrant and thus were irreparably tainted as "fruit of the poisonous tree" such that all evidence resulting from those searches should be suppressed under the Fourth Amendment.[4]  (*Id.* at 3.)  Berry also asserts the arrest warrant issued pursuant to the June 5, 2019 indictment is "fruit of the poisonous tree" and any evidence resulting from the execution of that warrant on July 11, 2019 is due to be suppressed as a result thereof.  (*Id.*)  Finally, Berry asserts the good faith exception in *United States v. Leon*, 468 U.S. 897 (1984) should not apply to the

---

[3] Berry does not challenge any evidence related to count one of the second superseding indictment which arose from his arrest on May 20, 2017.  (Doc. No. 38 at 2.)  Berry also does not challenge the veracity of the first search warrant affidavit under *Franks v. Delaware*, 438 U.S. 154 (1978). (Doc. No. 52, Tr. at 19.)

[4] The Eleventh Circuit has explained:

> Under the so-called "fruit of the poisonous tree" doctrine, admissions or confessions that the police induce by confronting a suspect with evidence obtained through an illegal search or seizure must be suppressed.  *See Fahy v. State of Conn.,* 375 U.S. 85, 91, 84 S. Ct. 229, 232, 11 L. Ed. 2d 171 (1963) (holding that "petitioner should have had a chance to show that his admissions were induced by being confronted with the illegally seized evidence"); *see also Amador–Gonzalez v. United States,* 391 F.2d 308, 318 (5th Cir. 1968) (holding a "confession, resulting from [an unlawful] seizure and ... subsequent narcotics arrest, was the 'fruit of the poisoned tree' and therefore inadmissible"), *overruled on other grounds by United States v. Causey,* 834 F.2d 1179 (5th Cir. 1987).

*United States v. Timmann*, 741 F.3d 1170, 1182 (11th Cir. 2013).

first search warrant because Judge Binford "wholly abandoned his role as a neutral and detached" magistrate and "was merely acting as a rubber stamp to law enforcement." (*Id.* at 6.)

The Government responds that the first affidavit search warrant did not lack probable cause and the search provided probable cause for the subsequent search warrants. (Doc. No. 40 at 8-9.)  Alternatively, the Government submits that should the court find the first search warrant affidavit lacked probable cause, the good faith exception in *Leon* should apply.  (*Id.* at 14-17.)

B. <u>Governing Legal Principles</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  This means a warrant generally must be obtained to search a residence unless an exception applies.  *Kentucky v. King*, 563 U.S. 452, 459 (2011).  "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested."  *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978)).  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts"—and must be judged on the totality of the circumstances presented in each case.  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

When reviewing an affidavit in support of a search warrant, the Supreme Court has stated that a magistrate should look to the totality of the circumstances, and that his task

is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Gates*, 462 U.S. at 238-39; *see also United States v. Karpordelis*, 569 F.3d 1291, 1310

(11th Cir. 2009).  The Eleventh Circuit has explained:

When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.  In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

*United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir. 1994).  "Courts reviewing the

legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical

manner."  *Id*. at 1361 (citation omitted).  Instead, "a realistic and commonsense approach

should be employed so as to encourage recourse to the warrant process and to promote the

high level of deference traditionally given to magistrates in their probable cause

determinations."  *Id*. (citation omitted).  Otherwise stated, "[a] federal court does not

review a state judge's probable-cause determination *de novo*, but rather considers only

whether the evidence viewed as a whole provided a 'substantial basis' for the finding of

probable cause at the time the warrant was issued."  *United States v. Snipes*, 444 F. Supp.

2d 1203, 1206 (M.D. Ala. 2006) (citing *Massachusetts v. Upton*, 466 U.S. 727, 732-33 (1984) (per curiam)).

"It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). To the extent an affidavit relies on hearsay, such as a tip given by a confidential informant or anonymous source, the speaker's veracity, reliability, and basis of knowledge are relevant for purposes of assigning value to the information. *Gates*, 462 U.S. at 230; *see also Martin*, 297 F.3d at 1314 (citing *Gates*). However, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *Martin*, 297 F.3d at 1314.

The burden of establishing that a search warrant is defective is upon the defendant. *United States v. Lockett*, 533 F. App'x 957, 965 (11th Cir. 2013) (citation omitted) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid."); *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978). The court's consideration of a defendant's facial challenge to a search warrant is confined to the "four corners" of the search warrant affidavit. *See United States v. Schulz*, 486 F. App'x 838, 841 (11th Cir. 2012) (citation omitted); *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982) (citations omitted) ("In passing on the validity of the warrant, consideration may be given only to information brought to the attention of the magistrate.").

"Under what is known as the 'exclusionary rule,' evidence seized as a result of an illegal search may not be used by the government in a subsequent criminal prosecution."

*Snipes*, 444 F. Supp. 2d at 1206 (citing *Martin* at 1312).   The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights" by prohibiting the use of illegally seized evidence in criminal prosecutions.   *United States v. Calandra*, 414 U.S. 338, 348 (1974).   The rule is designed to deter misconduct by law enforcement by banning evidence obtained in violation of the Fourth Amendment.   *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing *Nix v. Williams*, 467 U.S. 431, 442-43 (1984)).   The rule "has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion."   *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

In *United States v. Leon,* the Supreme Court created a "good faith exception" to the exclusionary rule where Fourth Amendment violations would otherwise prohibit the use of evidence seized during an unconstitutional search.   468 U.S. at 913.   The exception applies where evidence is obtained "by officers reasonably relying on a warrant issued by a detached and neutral magistrate," that is subsequently invalidated for lack of probable cause.   *Id*.   "[The] good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization," and in conducting this inquiry, a court may consider "all of the circumstances."   *Leon*, 468 U.S. at 922 n.23.

There are four situations where the *Leon* good faith exception will not apply: (1) where the magistrate or judge in issuing a warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," (2) where the issuing magistrate "wholly abandoned his

judicial role," (3) where the face of the affidavit underlying a warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and (4) where a warrant is "so facially deficient – *i.e*., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Id*. at 922-23.

The Government bears the burden of demonstrating the applicability of the good faith exception. *United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003) (citing *United States v. Travers*, 233 F.3d 1327, 1331 n.2 (11th Cir. 2000)). However, unlike the probable cause determination, the court is not limited to the "four corners" of a search warrant affidavit in making this determination, it may look beyond those four corners to determine whether the good faith exception applies. *Martin*, 297 F.3d at 1318.

C. Analysis of Berry's Motion to Suppress

1. Probable cause to search Berry's residence and property

Berry contends that "the original warrant affidavit and warrant were deficient," because the affidavit "did not support probable cause that [he] was involved in any criminal conduct, nor did it support probable cause that contraband or evidence would be found in a particular place – the subject residence, car or outhouses." (Doc. No. 38 at 2-3.) Berry argues there was no probable cause to search his residence and property for evidence of the firearm assault since the "informant" for the firearm assault was uncooperative, there is "no evidence the shell casings in the front of the house matched those in the victim," "no evidence that he was involved in the incident" and no evidence "that the instruments of the crime were taken into [his] home." (*Id*. at 5-6.) The court disagrees.

Considering the "four corners" of the affidavit submitted to obtain the first search warrant, the court finds there is a substantial basis for the finding of probable cause to believe that evidence of the firearm assault was at Berry's property at the time the warrant was issued.[5]  The affidavit recited that officers learned from a gunshot victim at a local hospital that he was shot in the 700 block of Monroe Street and his assailant fled into the back yard of the residence at 718 Monroe Street.  (Doc. No. 40-2 at 1; Doc. No. 40-3.) Despite the uncooperative demeanor of the victim, officers corroborated his report when they went to the 700 block of Monroe Street and found shell casings in the road in front of Berry's residence.  (*Id.*)  The affidavit noted that the 718 Monroe Street residence had a new privacy fence around the property.  (Doc. No. 40-2 at 2.)  This information in the affidavit established probable cause to believe that evidence of the firearm assault would be found on Berry's property, particularly within his fenced back yard.

Further, information in the affidavit established probable cause to believe that evidence of the firearm assault would be found at Berry's residence.  The most critical statements in the affidavit relating to the firearm assault were the officers' observation of surveillance equipment mounted on Berry's residence.  The affidavit explained that the officers' canvassed the area for leads, observed Berry's exterior surveillance cameras and noticed that one of the cameras was positioned such that it pointed towards the area where

---

[5] Given the Government's response to the motion to suppress evidence is silent as to whether the affidavit contained probable cause to search Berry's residence for evidence of the murder (Doc. No. 40 at 8-13), the undersigned declines to address that issue because the affidavit established probable cause to believe that evidence of the firearm assault would be found at Berry's residence and property.

the firearm assault occurred in the street as evidenced by the location of the shell casings. (Doc. No. 40-2.)  This information established that there was a fair probability that evidence of the firearm assault would be stored in the surveillance system in Berry's residence or outbuildings.  *Martin*, 297 F.3d at 1314.  Berry's exterior surveillance system and camera placement provided sufficient probable cause for the warrant allowing a search of Berry's residence and premises for evidence of the firearm assault, particularly any DVR recording system and video footage.

The court is unconvinced by Berry's argument that the affidavit is deficient due to the victim's lack of cooperation and Investigator Faulkner's failure to connect the caliber of the discovered shell casings to the firearm assault under investigation.  (Doc. No. 38 at 5-6.)  As the Government correctly points out, our "courts have traditionally viewed information drawn from an ordinary witness or crime victim with considerably less skepticism than information derived from anonymous sources."  (Doc. No. 40 at 10) (quoting *United States v. Martinelli*, 454 F. 3d 1300, 1307 (11th Cir. 2006)).  Here, the information was not from an informant, but a victim whose narrative was supported by the officers' independent observations.  *See Lockett*, 533 F. App'x at 966 (finding affidavit valid where officers' observations were consistent with information received).  Moreover, the officers' observation of the shell casings corroborated the victim's statement regarding the firearm assault and its location.  The absence of a forensic connection between the 9mm shell casings and the victim's injuries in the affidavit does not negate probable cause.

Accordingly, considering the information provided in the affidavit, the court concludes that the affidavit stated facts sufficient to justify a conclusion that evidence of

the firearm assault would probably be found at Berry's residence and property. The officers had probable cause to search Berry's residence and property for evidence of the firearm assault to locate potential recordings of the firearm assault and to locate the firearm or any ammunition in the enclosed back yard. Berry has not carried his burden to show that the first search warrant is invalid thus his motion to suppress evidence is due to be denied.[6]

### 2.  Good faith exception

Even if the first search warrant had lacked probable cause, the Government contends that the motion to suppress should still be denied because the officers relied in good faith on the search warrants. (Doc. No. 40 at 14-17.) The court agrees.

None of the circumstances precluding the good faith exception apply here. There is no allegation that false information was included in the affidavit. As already discussed, the affidavit set forth sufficient probable cause, and in any event is not "so lacking . . . as to render official belief in its existence entirely unreasonable." *Martin*, 297 F.3d at 1313 (citation and internal marks omitted). There is nothing in the record that even hints that Judge Binford, who reviewed the first affidavit and signed the search warrant, engaged in any misconduct or abrogation of judicial responsibility. The warrant is facially valid in that it describes in sufficient detail the property to be searched and items to be seized and

---

[6] The court need not reach Berry's challenge to the succeeding search warrants or July 11, 2019 search warrant as the first search warrant affidavit established probable cause. In other words, Berry's "fruit of the poisonous tree" argument fails because here the tree is not poisonous. The first affidavit did not violate Berry's constitutional rights and thus did not taint any subsequent affidavits for search warrants.

is signed by Judge Binford.  (Doc. No. 42-1.)  *See Travers*, 233 F.3d at 1330 (citation omitted) (finding warrant "was not so facially deficient—*i.e.*, failing to particularize the place to be searched or the things to be seized—that the executing officers could not have reasonably presumed it to be valid").

Berry argues, without citing any supporting law or facts, that Judge Binford "wholly abandoned his role as a neutral and detached" magistrate and "was merely acting as a rubber stamp to law enforcement."  (Doc. No. 38 at 6.)  But *Leon* explains that this exception applies only "where the issuing magistrate wholly abandoned the judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S. Ct. 2319, 60 L. E. 2d 920[ ] (1979)."  *Leon,* 468 U.S. at 923.  In *Lo–Ji Sales,* the judge "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation."  *Lo–Ji Sales, Inc.,* 442 U.S. at 327.  There is no evidence that Judge Binford abandoned his neutral and detached role in the manner condemned by *Leon* and *Lo–Ji Sales.*  On the contrary, Investigator Faulkner's credible testimony at the evidentiary hearing showed that he met with Judge Binford at Judge Binford's office at the Houston County Courthouse, he presented the affidavit to Judge Binford, Judge Binford read it, he discussed the affidavit with Judge Binford and Judge Binford signed the warrant.  (Doc. No. 52, Tr. at 14-16.)  It is unclear exactly what was said between Judge Binford and Investigator Faulkner that day concerning the facts contained in the affidavit and underlying search warrant because Investigator Faulkner testified that he could not recall the exact conversation.  (*Id.* at 15, 40, 49, 52-53.)  However, the simple fact that Judge Binford found the facts in the affidavit sufficient to support a finding of probable cause

does not suggest that he wholly abandoned his judicial role.  *See Martin*, 297 F.3d at 1317-18 (holding that even though affidavit was later found to be lacking in probable cause for issuance of search warrant, issuing magistrate judge had not wholly abandoned his judicial role where there was no indication he did not read affidavit or relied solely on close relationship with affiant when signing warrant).  Therefore, the court finds this exemption to the *Leon* good faith exception does not apply to this case.

Under the totality of the circumstances, the court finds Investigator Faulkner acted in objective good faith when applying for the warrant and reasonably believed that probable cause existed to execute the search warrant.  Accordingly, the law enforcement agents executing the search warrant were justified in believing in its validity and the good faith exception prevents suppression of the evidence seized during the execution of the warrant even if the warrant was found to lack probable cause.  The Government has carried its burden of demonstrating the good faith exception applies.

## IV.  CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendant's motion to suppress (Doc. No. 38) be DENIED.

It is further

ORDERED that the parties shall file any objections to the said Recommendation not later than **June 30, 2020.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties

are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the Magistrate Judge's findings and § 636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the District Court's order based on unobjected-to-factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  11th Cir. R. 3-1; *Resolution Trust Co. v. Hallmark Builders, Inc*., 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 15th day of June, 2020.


/s/ Jerusha T. Adams_____
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE